UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ROBERT LEMMO,

    Plaintiff,

  -against-

POLICE OFFICER KELVIN MCKOY,
POLICE OFFICER BRUCE TULLOCH, and
NEW YORK CITY POLICE DEPARTMENT,

    Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**

08-CV- 4264 (RJD)

DEARIE, Chief Judge.

  Pro se plaintiff Robert Lemmo brings this action pursuant to 42 U.S.C. § 1983 alleging that his constitutional rights were violated when certain officers subjected him to excessive force following his arrest for disorderly conduct on January 1, 2006. Liberally construed, the complaint raises two distinct section 1983 claims, one for false arrest and the other for excessive force. Before the Court is defendants' motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

### FACTUAL BACKGROUND[1]

  On New Year's Eve 2005, plaintiff and several of his friends went out to celebrate. Plaintiff admits that he had several drinks and was intoxicated. At some point after leaving the celebration, plaintiff was walking on the "L trestle" of the subway near Roosevelt Avenue and 99th Street in Queens when he was stopped by police. According to plaintiff's deposition, he was asked by the police to provide identification and not to smoke on the trestle and, when he refused, an officer slapped the cigarette out of his mouth and arrested him. Plaintiff was

---

[1] The Court writes here for the parties only, whose familiarity with the facts is assumed.

immediately handcuffed, and according to even his own account, there was no physical altercation at the time of arrest.

The police version differs somewhat. In his affidavit, arresting officer Bruce Tulloch states that at a checkpoint set up by members of the Queens North Task Force, at approximately 1:45 a.m., he observed plaintiff "using abusive language toward officers and other persons in the area" and that plaintiff "repeatedly disobeyed lawful orders to leave the checkpoint." Tulloch prepared the arrest paperwork and, in his report, stated that he observed plaintiff "cursing profusely at people causing them to leave to avoid [plaintiff]" and also observed plaintiff "obstruct pedestrian traffic." Plaintiff was charged with two counts of disorderly conduct.

Once at the precinct (the 110th), plaintiff was placed in a holding cell and eventually brought back out to be fingerprinted. Apparently he was not handcuffed at this point. Officer Tulloch, in his affidavit, states that he attempted to do the fingerprinting, but plaintiff "became irate and combative and refused to cooperate" and that "with the assistance of other officers," plaintiff was placed back in handcuffs and returned to a holding cell. Plaintiff's account of the same incident in his deposition differs in certain particulars but is not irreconcilable with Officer Tulloch's account. According to plaintiff, when he was brought out to be fingerprinted, he began to get upset because he had believed he would merely receive a ticket but instead realized he was "going through the system." Plaintiff admits that he resisted the effort to fingerprint him, that the "discussion became a little louder," that he asked to see a captain, and that the encounter "turned into a shouting match." He further claims that he was thrown on the floor and put in a headlock in order to be re-handcuffed.

Only now does the story reach the point where plaintiff claims he was the victim of excessive force: according to plaintiff's deposition, once he was re-handcuffed, he was escorted

by two officers back to a cell (referred to throughout his deposition as "a second cell") and while en route, one of the officers twisted his thumbs. Plaintiff claims that the shouting match had just ended and that, being handcuffed, he was not resisting the effort to escort him to the second cell. But plaintiff also admits that, immediately upon being placed in the second cell, he shouted at the officers, essentially taunting them by telling them not to open the cell again because he was angry and ready to assault them. According to plaintiff, instead of ignoring him, the officers opened and entered the cell, went behind him, grabbed his thumbs and "both cranked at [them] at the same time." Plaintiff further claims that he asked for medical attention and was spit on.

A topic of inquiry at plaintiff's deposition was whether he could identify which particular officers allegedly twisted his thumbs. Plaintiff stated that it was the same officers who arrested him on the street, and that he was sure that Officer Tulloch was one of them. As to the other defendant named in this action, Officer Kevin McKoy, plaintiff admitted that he "could never pinpoint Mc[K]oy." He was sure that "there was another white guy assisting Tulloch" but "whether his name is Mc[K]oy or not [he] couldn't" say.

Pressed further, plaintiff insisted that he remembered Tulloch: "I could point him out because it is four years . . . Him I could remember." As for McKoy, plaintiff explained that his "name is involved because under my assumptions the one that was assisting Tulloch was Mc[K]oy." Plaintiff further testified that, "The one that was doing the prints and what do you call it, twisted the right thumb, because I know Tulloch grabbed the left…that I know for a fact is the one that Tulloch twisted. He opened the cell, came behind me, grabbed it, and they both cranked it at the same time."

On the question of identity, Officer Tulloch, as noted, stated in his affidavit that it was he who attempted to fingerprint plaintiff, but his affidavit does not address the ensuing events other

3

than by averring that "[a]t no point on January 1, 2006 did [Tulloch] use excessive force against plaintiff" or "witness excessive force being used."

Officer Kevin McKoy, by contrast, avers that that he was not present at the 110th precinct on January 1, 2006 and did not come into contact with plaintiff on that date. According to his affidavit and supporting documentation, McKoy was working in the Expedited Affidavit Program at the Queens Court Section, located on Queens Boulevard, and was on the receiving end of the arrest paperwork prepared and faxed by Officer Tulloch.

Returning to the events on the night in question, plaintiff's and defendants' account of what occurred after the incident in the second cell are generally consistent. Emergency Medical Services were called to transport plaintiff to Elmhurst Hospital Center as an "emotionally disturbed person" or "EDP," to be assessed before arraignment. All the relevant Elmhurst paperwork is part of the record: on the admission form, the "reason for referral" section states that plaintiff was, according to the NYPD, "acting bizarre" and was to be evaluated as a possible "EDP." The initial evaluation report states, *inter alia*, that plaintiff "reported that he was beaten up by NYPD" but also that upon initial approach by medical personnel, plaintiff was "uncooperative," "incoherent," and "irritable, with an angry affect." This same report also states, "unable to determine safety of patient at this time."

Additional notes document that plaintiff complained of pain in the thumb of his left hand, and that it was tender. Not all of the medical records contain times, but it appears that plaintiff spent several hours at Elmhurst and was eventually "psychiatrically cleared to go to arraignment." It was recommended that he receive additional psychiatric care but not in an inpatient setting. Several additional pages in the packet of Elmhurst records contain "assessment" sections. One states that plaintiff "only complains of wrist and thumb pain;"

another, noting that plaintiff was "presently calm, quiet and cooperative," reports "both thumbs swollen" and "[l]eft wrist swollen." A separate report also states that plaintiff was "now calm." "Minor scratches on both wrists" were also noted. In the "violence assessment" section of another report, plaintiff is reported as having "denie[d]" having a history of violence but also having "state[d] [that] he had fight with NYPD last night." When asked what makes him angry or upset, plaintiff replied "low life cops." Plaintiff also told medical evaluators that he had been drinking.

Following his discharge from Elmhurst, plaintiff was arraigned, after 11:00 p.m., and remanded into the custody of Department of Corrections. According to the record of DOC's medical screening, plaintiff's physical condition was "ok." According to defendants, plaintiff did not receive or request medical treatment while in DOC custody (at Riker's Island). In his deposition, however, plaintiff claims that he asked for treatment but was told there was nothing that could be done.

On January 6, 2006, plaintiff pled guilty to disorderly conduct and was sentenced to time served.

Plaintiff admits that he did not seek additional treatment and was not diagnosed with thumb damage. But he states nevertheless that the swelling in his thumb lasted for a week and a half after his arrest, that the pain in his thumbs lasted several weeks, and that during that time he could not button or zipper clothes, or hold a coffee cup or brush his teeth. He further claims that his thumb joints have never been the same; at the time of his deposition he was working in lumber, and stated that if he went to grab for something his thumb still did not flex in the right way.

5

## DISCUSSION

The parties' familiarity with the well-established summary judgment standards is assumed. See generally Fed.R.Civ.P. 56(c)(2); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); ; Sledge v. Kooi, 564 F.3d 105, 108 (2d Cir.2009) (record to be construed in the light most favorable to the non-moving party, all reasonable inferences must be drawn in his favor, and all ambiguities resolved his way).

**A.    False Arrest**

Plaintiff's § 1983 false arrest claim must be dismissed as a matter of law because he pled guilty to the charges stemming from the arrest he challenges and the conviction has not been invalidated. See Heck v. Humphrey, 512 U.S. 477, 486-87 (1994) (section 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, or called into question by issuance of writ of habeas corpus; unless conviction so invalidated, claim for damages not cognizable); Cameron v. Fogarty, 806 F.2d 380, 386-89 (2d Cir. 1986) (false arrest plaintiff "can under no circumstances recover if he was convicted of the offense for which he was arrested"), cert. denied, 481 U.S. 1016 (1987); Simmons v. Kelly, 2009 WL 857410, *5 (S.D.N.Y. Mar. 31, 2009) ("a guilty plea that is not overturned on appeal provides conclusive evidence of probable cause and, accordingly, bars a section 1983 claim for false arrest or imprisonment stemming from the conviction at issue"). Accordingly, defendants are entitled to summary judgment in their favor on plaintiff's false arrest claim.

**B.    Excessive Force**

There are three standards for excessive force depending on when the alleged violation occurred. If excessive force was allegedly used before arraignment, the Fourth Amendment

standards govern. Graham v. Connor, 490 U.S. 386, 394 (1989) ("[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment"); Sloan v. Kraus, 06 CV 5372, 2010 WL 3489397, *10 (S.D.N.Y. Sept. 3, 2010). If the alleged violation occurs after arraignment but before conviction, then the Fourteenth Amendment applies. Nimkoff v. Dollhausen, 08 CV 2856, 2010 WL 4678711 (E.D.N.Y. 2010). Allegations of excessive force occurring after conviction are subject to an Eighth Amendment analysis. Ingraham v. Wright, 430 U.S. 651, 671, n. 40 (1977). The Second Circuit has held that the Fourteenth and Eighth Amendment tests are essentially the same and apply to claims brought by pre-trial detainees and sentenced convicts. United States v. Walsh, 194 F.3d 37, 48 (2d Cir. 1999).

Defendants argue that plaintiff's excessive force claim is governed by the Fourteenth Amendment because the alleged misconduct occurred at the police precinct, but it is undisputed that plaintiff had not yet been arraigned, so his claim is governed by the Fourth Amendment. Sloan, 2010 WL 3489397 at *10 ("Here, because plaintiff alleges excessive force by a police officer prior to his arraignment, a Fourth Amendment excessive force analysis applies," citing Graham); Santiago v. City of New York, 2000 WL 1532950, *4 (S.D.N.Y. Oct.17, 2000) (section 1983 plaintiff "was under arrest and in custody . . . but had not been arraigned or convicted of any crime. . . [as] neither a pre-trial detainee nor a prisoner, but an arrestee in custody," plaintiff "is protected from excessive force by the Fourth Amendment's prohibition on unreasonable seizures of the person," citing Graham).

The Fourth Amendment standard is said to be one of "objective unreasonableness," Graham, 490 U.S. at 396; Nimely v. City of New York, 414 F.3d 381, 390 (2d Cir. 2005).

Because the application of such a generalized standard to the facts of particular cases can be challenging, it is useful to draw liberally upon then Chief Justice Rehnquist's description of the test in Graham:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . .Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id., 490 U.S. at 396 (internal quotations and citations omitted).

Graham further teaches that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The Court labels this a "standard of reasonableness at the moment," id., and explains that just as "[t]he Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises," the "same standard" applies "[w]ith respect to a claim of excessive force." Id. (internal citations omitted). Quoting earlier precedent, Graham reiterates that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id., 490 U.S. at 396-97 (internal quotation marks omitted).

Finally, in addition to requiring that account be taken of the realities of police work, Graham underscores that the test is objective, not subjective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Stated bluntly, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id.

The Second Circuit applies the Graham test when assessing whether force is excessive under the Fourth Amendment for section 1983 purposes. See Nimely v. City of New York, 414 F.3d 381, 390 (2d Cir. 2005). Borrowing from the "objective" component of the Eighth Amendment test for excessiveness and the Supreme Court's observation that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," the Second Circuit and district courts in the Circuit recognize the concept of "de minimis" injury and, when the injury resulting from alleged excessive force falls into that category, the excessive force claim is dismissed. See e.g., Smith v. City of New York, 2010 WL 3397683, *10 (2010) ("Courts in this Circuit have consistently held that an injury is de minimis when it is temporary and/or minor in severity") (collecting cases). Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, Richardson v. New York City Health and Hospitals Corp., 05 Civ. 6278, 2009 WL 804096, at *10 (S.D.N.Y. Mar. 25, 2009), brief numbness from tight handcuffing, Hamlett v. Town of

9

Greenburgh, 2007 WL 119291 (S.D.N.Y. Jan.17, 2007), claims of minor discomfort from tight handcuffing, Vogeler v. Colbath, 04 CV 6071, 2005 WL 2482549 (S.D.N.Y. Oct.6, 2005), and two superficial scratches with a cut inside the mouth. Warren .v Westchester County Jail, 106 F. Supp. 2d 559 (S.D.N.Y. 2000) (an Eighth Amendment case).

On the other hand, courts have allowed plaintiffs to recover, even though the injury caused was not permanent or severe, where the force used was excessive. See, e.g., Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987). In Robison, the Circuit held that the plaintiff's testimony that an officer "'pushed' her against the inside of the door of her car, 'yanked' her out, 'threw [her] up against the fender,' and 'twisted [her] arm behind [her] back,'" and that "she suffered bruises lasting a 'couple weeks,'" was "sufficient to prevent the summary dismissal of a § 1983 claim for excessive force." 821 F.2d at 923-24. The Court further explained that, "[w]hile Robison did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim" because "[i]f the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." Id. at 924. Although Robison pre-dates Graham, the Second Circuit continues to cite the decision as an instructive example. See Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir.2004) ("we have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising," citing both Graham and Robison). Indeed, in Maxwell, the district court had granted summary judgment for the defendants because "plaintiff's claim that she allegedly scraped her head when being shoved into the car is not sufficient for any reasonable jury to find excessive force claim in this case—minor scrapes, bumps or bruises potentially could occur,

10

often unintended, during any arrest, and an arresting officer cannot be held unremittingly liable for every such incident." Maxwell, 380 F.3d at 109 (quoting lower court decision). The Second Circuit reversed, finding the claimed conduct and injury sufficiently jury-worthy. Id. at 109-10.

Following Robison and Maxwell is the decision of Judge Bianco in Davenport v. County of Suffolk, 99 CV 3088, 2007 WL 608125 (E.D.N.Y. Feb. 23, 2007). While "recogniz[ing] that there may be certain circumstances where the alleged unconstitutional act and injury are so de minimis that it cannot rise to a constitutional violation as a matter of law," Judge Bianco nevertheless allowed the plaintiff to amend her complaint to add a claim for excessive force alleging that an officer banged his head against the top of the police car during the arrest. Davenport, 2007 WL 608125, *9-10. Judge Bianco explained that, "[a]lthough the focus of Davenport's proposed amendment pertains [only] to the alleged banging of his head on the police car during the arrest and he proffers no medical evidence of injury in connection with his motion to amend, the Court cannot find that such a claim is necessarily futile." Id. at *10. Integral to the reasoning in Davenport (and the reasoning of the numerous cases it collects) is the apparent gratuitousness of the police conduct at issue; as Judge Bianco explains, "In the instant case, Davenport may be able to demonstrate that the officer intentionally hit his head on the car during the arrest, causing an injury to his head, and he could argue that this alleged gratuitous use of force by an officer constituted an objectively unreasonable use of force." Id. In short, although the Graham test does not consider the subjective intent of the officer(s) per se, Davenport and the line of authorities on which it relies recognize that intentional, gratuitous uses of force that are not required to subdue an individual likely fail the Graham objective unreasonableness test. See, e.g., Pierre-Antoine v. City of New York, No. 04-CV-6987 (GEL), 2006 WL 1292076, at *4 (S.D.N.Y. May 9, 2006) (use of force against an already subdued

11

individual would constitute an objectively unreasonable use of force under the Fourth Amendment); Graham v. Springer, No. 03-CV-6190 (CJS), 2005 WL 775901, at *6 (W.D.N.Y. Apr. 5, 2005) (summary judgment denied because plaintiff was kicked while on the ground in handcuffs).

Judge Bianco thus concluded that, "[a]lthough Davenport has not alleged or proffered injuries as significant as those in Maxwell and referred to his injury as a bump on the head in oral argument, the Court cannot conclude as a matter of law that any claim of this type . . . would necessarily be futile such that the Court should deny leave to amend. A jury may consider the lack of serious injury as evidence that the implemented force was not excessive, and may weigh it against Davenport's testimony, but that does not mean that there are no circumstances under which Davenport can prevail." Davenport, 2007 WL 608125, *11

Based on the reasoning and result in Robison, Maxwell, and Davenport, I likewise deny summary judgment on plaintiff's excessive force claim. To be sure, his injuries are not severe. But they are not, on this record, imagined. Nor are they materially less severe than those that have been held sufficient to survive summary judgment in Maxwell and Robison. What particularly gives me pause in this case is the fact that, if plaintiff's testimony were credited, the cranking of his thumbs by police officers was entirely gratuitous: granted, plaintiff had been uncooperative when Officer Tulloch attempted to fingerprint him, and by his own admission, hostilities had escalated. But plaintiff does not target as excessive the force that was used to subdue him at that point. What he complains of is what occurred when he was already re-handcuffed and re-secured in a holding cell. Granted, too, plaintiff appears to have taunted the officers by shouting that they should not let him out again because he was angry and might harm them, but the officers could have, and should have, simply ignored him. Despite plaintiff's

12

verbal taunts, there is no indication that he posed a serious threat, handcuffed and inside his cell, to the officers outside. The cited authorities make it clear that it should be for a jury, rather than this Court, to decide whether it was objectively unreasonable under the circumstances (including the relative non-severity of the charges plaintiff faced) for the police officers to re-open the cell and "crank" plaintiff's thumbs while they were handcuffed behind his back. See Graham,490 U.S. at 396 (factor to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"). Additionally, the record contains only a general denial by the officers with respect to this episode rather than an actual conflicting account. The jury can and should decide what actually occurred and what, if any, compensation is due plaintiff. See Murray v. Williams, No. 05-CV-9438 (NRB), 2007 WL 430419, at *7 (S.D.N.Y. Feb. 7, 2007) (laceration to lower lip, a bloody nose, pain and suffering, and mental anguish held not to be de minimis); Amato v. City of Saratoga Springs, 170 F.3d 311, 317 (2d Cir.1999) ("While the main purpose of a §1983 damages award is to compensate individuals for injuries caused by the deprivation of constitutional rights, a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury"). Indeed, to this Court, it seems entirely appropriate that a jury, citizens of this city, should decide whether an officer or officers, sworn to protect and serve the community, failed to deliver on their professional vow.

**C.    Qualified Immunity and the Proper Defendant(s)**

    **1.    Officer McKoy**

Plaintiff's papers offer nothing to refute Officer McKoy's averment that he was not present at the 110th precinct on the night of plaintiff's arrest and that he did not come into

13

contact with plaintiff at that time. Accordingly, defendant McKoy is entitled to summary judgment on all claims against him. Barratt v. Joie, 2002 WL 335014, *6 (S.D.N.Y. Mar. 4, 2002) ("Because § 1983 imposes liability only upon those who actually cause a deprivation of rights, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983") (internal quotation and citation omitted).

### 2. Officer Tulloch

Defendant Tulloch asserts qualified immunity as a defense to plaintiff's claims. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, __ 129 S.Ct. 808, 815 (2009) (internal citation omitted). The "'driving force' behind creation of the [ ] doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." Id. (internal citations omitted).

In Fourth Amendment excessive force cases, however, the qualified immunity and excessive force analyses "converge on one question: [w]hether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." Cowan v. Breen, 352 F.3d 756, 764 n. 7 (2d Cir. 2003). See also Scott v. Henrich, 39 F.3d 912, 914 (9th Cir. 1994) ("In Fourth Amendment unreasonable force cases ... the qualified immunity inquiry is the same as the inquiry made on the merits").

Having determined that plaintiff's excessive force claim presents triable issues of fact, I necessarily and likewise conclude that defendant Tulloch is not entitled to summary judgment on his defense of qualified immunity.

## CONCLUSION

The motion for summary judgment is granted to the extent of (i) dismissing plaintiff's false arrest claim; (ii) dismissing all claims against Officer McKoy; and (iii) dismissing all claims against the NYPD. The motion for summary judgment is in all other respects denied. The case shall proceed to trial solely on the excessive force branch of plaintiff's § 1983 claim. The parties shall appear for a status conference on April 8 at 11:45 a.m. in Courtroom 10A.

SO ORDERED.

Dated: Brooklyn, New York
      March 8, 2011

                                        s/ Judge Raymond J. Dearie

                                        _____
                                        RAYMOND J. DEARIE
                                        United States District Judge